Mr. Justice CAMPBELL
 

 delivered the opinion of the court.
 

 The appellees instituted their suit in the District Court of the United States for the district of Maryland, sitting in admiralty, against the steamer Louisiana, in a cause of collision arising between the steamer and the schooner George D, Eisher, in the Chesapeake bay, in December, 1855, in which the latter was run into and sunk, and became a total loss.
 

 The libellants charge, that before and at the time of the collision the schooner was bound oh a voyage from Philadelphia to Norfolk, through the Chesapeake bay, and was properly manned and éqúipped for that voyage, and carefully navigated.
 
 *4
 
 That the steamer was seen from the schooner, shortly after ten ' o’clock P. M., about eight or ten miles distant, steering up the .bay, the schooner making about four knóts an hour, in a sóuthwest course, against the wind, which was'blowing about south by east. That when the steamer was within a half mile or a mile distant, she appeared to. be hauling to the westward, with the apparent intention of crossing the schooner’s bows, but shortly afterwards seemed to be again hauling to the eastward, 'as if to drop under the schooner’s stern. That this last movement was made too late, the distance between the two vessels being too inconsiderable to allow it to be .of any avail. . That, the mopn was shining, and the schooner might have been seen at a considerable distance. That the course of the steamer was between north-northeast and northeast.
 

 . The claimants in their answer admit the fact of the collision, and the consequent loss of the schooner, and that it was a moonlight night, but say that'it was cloudy in the western part of the horizon, and, inconsequence of heavy banks of snow-clouds in that quárter,'it was'impossible to see vessels, coming in that direction, without lights, at any ^considerable distance, and a ' steamer,' therefore, coining up the bay, could not máke such regulations as to speed and course as to avoid collisions, that Wquld have been practicable and proper under other and more favorable circumstances. They allege that the-schooner did not carry a light, ¿nd was the only vessel seen without one, ' and in consequence of this deficiency, and the character of the night,. the schooner was not visible,, and could not be seen until the two vessels were within the short distance of three or four-hundred yard
 
 s.
 

 Tn reference to the- fact of .the'eollision/they answer, that when-the schooner was first seen from the steamer,, the schooner was-to the eastward, and proper aetión was .had on-'board the steamer-to direot her course to the westward; but when the course- of-the. schooner in that 'direction was .ascertained, the ‘course ofi the steamer was changed, .and the boat was stopped and backed; but from the proximity of the vessels at this time, it was impossible by any effort to avoid the .collision. The steamer was runnihg-at the rate of fifteen miles-an hour before
 
 *5
 
 this time. The District Court pronounced a decree of condemnation, which was affirmed in the Circuit Court on appeal.
 

 The evidence convinces the court that the schooner might have been distinctly seen from the steamer at a greater distance than.a half mile.
 

 It is shown that another vessel was sailing in the wake of the schooner, and was guided in her course by her, and that the schooner was distinctly visible to those who were on board that vessel at a greater distance.
 

 It also satisfactorily appears that the schooner was. in fact discovered by the lookout on board the steamer when the vessels were several hundred yards apart, and that, by careful, management of the steamer, the collision might then have been avoided.
 

 The captain of the Louisiana says: “ That after passing the Rappahannock light-boat I saw a black object;, it appeared to be heading about south-southwest down the bay,; it was about two points or two points and a half to the east of us. ■ I could not tell at that moment whether it. was a. .vessel at anchor or under way, but directly discovered it was a vessel under way,, and she kept right hard off to the westward. This vessel had no lights. I think the distance was from two hundred yards to two hundred and fifty. As soon as I. saw her jib, I called to Mr. Marshall (pilot) to stop and back.” Cross-examined, he says: “From the time I first saw the vessel until the time of the collision, was, I should suppose, two minutes, more or less. The vessel changed her course, and kept off hard to the westward. I saw her jib, which enabled me to judge that it was a vessel under way. The change took, place immediately after I first saw the object.. When I first saw it, it looked like a cloud. I could not tell if it was a vessel at anchor or under way. When I saw the jib, I first- knew it was a vessel under way.”
 

 Notwithstanding the uncertainty in the miud of this officer, the vessel under his command continued on in her voyage with unabated speed.' No order was given to arrest her progress till a collision with the schooner had become ihevitáble. This was a grave error, and it was followed by -disastrous conse
 
 *6
 
 quences, for which the owners must render indemnity. In the case of the Birkenhead, (3 W. Roh., 75,) the steamer was directed upon the supposition that a sailing vessel under way was at anchor, and' proper precautions were taken under that hypothesis. The circumstances were such as might have occasioned a mistake. But the judge of the admiralty, with the advice of the Trinity masters, condemned the steamer to compensate for the collision, saying “that she should not have prosecuted her voyage in any uncertainty, but should have eased or reversed her engines until the fact was ascertained.”
 

 The case of the James Watt (2 W. Rob., 271) is similar in its circumstances to the one under consideration. The master testified, that when he discovered the sailing vessel, he ported bis helm without stopping to ascertain her course. “In my apprehension,”, said the judge, “the master of the James Watt would have acted, under the circumstances, with greater prudence and caution, if, upon first discovering the sailing vessel, instead of porting his helm, he had continued his course at •slacked speed, by easing his engines till he was able to discover the course the sailing vessel was steering, and then acting, according to circumstances. If he had pursued this course, it is apparent from the evidence, that, in the short space of about a minute after the sail was reported, he would have discovered her course, and could have adopted the measures that might altogether have prevented the collision.”
 

 The evidence shows that the George D. Fisher was making a southwést course, and was close hauled upon the wind. That she did notvary her course after, the steamer came in sight. That the steamer was first directed to the westward, and afterwards to the eastward, and then stopped and backed, and that these contrary; movements were the result of the doubts of her officers as to the position or course of the schooner. If the . order to ease the engines, or to stop, had been given in the first instance, the probability is that the catastrophe would have been avoided. ^
 

 . The decisions of this court have settled that this was the duty of the steamer under such circumstances. (Peck
 
 v.
 
 Sanderson, 17 How., 178.) It is contended on the part of the
 
 *7
 
 appellees that the schooner is responsible for failing to carry a light. In the case of the Osmánli, (7 Notes of Cases, 507,) the learned judge of the admiralty says: “That no question has been more mooted and left more unsettled than this — whether it is the duty of a sailing vessel at night to show a light? Beyond all doubt, it has been determined there is no such general obligation; at the same time, there have been occasions on which, for the sake of avoiding a misfortune, which was in' all human probability likely to occur, it became the duty of a vessel to show a light.” In.the present case, we have not been able to discover any fact that imposed the obligation upon the schooner to do so. The night was moonlight; and though the light was occasionally obscured, the evidence, does not show that it was so, to a degree that rendered the navigation of the hay at all dangeroús, if care, skill, and vigilance, had been employed upon the different vessels.
 

 The court is of opinion that the schooner was discerned from the steamer in sufficient time, and that the latter might have avoided the collision by the exercise of proper care.
 

 ’Decree affirmed.
 

 Mr. Justice DANIEL dissented, for want of constitutional power in courts of the United States in admiralty.