THE BAILEY GATZERT.

(Circuit Court of Appeals, Ninth Circuit. April 25, 1910.)

No. 1,746.

1. COLLISION (§ 100*)—PRECAUTIONS FOR PREVENTING COLLISIONS—SPEED IN FOG—"MODERATE SPEED."

A steam vessel passing from Portland down the Willamette river in a dense fog at a speed of 15 miles an hour, in view of the extensive commerce on such river, was not going at the moderate speed required by article 16 of the Inland Navigation Rules (Act June 7, 1897, c. 4, 30 Stat. 99 [U. S. Comp. St. 1901, p. 2880]), which provides that in a fog a vessel shall go at a moderate speed, "having careful regard to the existing circumstances and conditions."

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 215; Dec. Dig. § 100.*

For other definitions, see Words and Phrases, vol. 5, pp. 4551, 4552.

Collision rules—speed of steamers in fog, see note to The Niagara, 28 C. C. A. 532.]

2. COLLISION (§§ 75, 99*)—PRECAUTIONS FOR PREVENTING COLLISIONS—VESSELS AT ANCHOR—LIGHTS, SIGNALS, AND LOOKOUTS.

A dredge lawfully fixed in a channel for improving it is to be considered as a vessel at anchor, and is under obligation to use the same precautions to guard against collisions that a vessel at anchor is in respect to the exhibition of lights, maintaining a watch and other measures calculated to make its position known.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 113, 115, 211, 212; Dec. Dig. §§ 75, 99.*]

3. ADMIRALTY (§ 118*)—APPEAL—REVIEW—FINDINGS OF FACT.

On appeals in admiralty, when questions of fact are dependent on conflicting evidence, the decision of the District Judge who heard and saw the witnesses will not be reversed unless clearly against the evidence.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. § 770; Dec. Dig. § 118.*]

4. COLLISION (§ 100*)—VESSELS AT ANCHOR—LOOKOUT.

Whether or not an efficient lookout was maintained on a dredge at work in a channel during a dense fog held immaterial, in a suit for collision with the dredge by a moving steamer, where the fog bell on the dredge was being rung at intervals of less than a minute, and could be

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

heard many times the distance at which an approaching vessel could be seen.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 214; Dec. Dig. § 100.*]

5. COLLISION (§ 100*)—PRECAUTIONS FOR PREVENTING COLLISIONS—SPEED IN FOG.

A decree affirmed. holding a steamer passing down the Willamette river from Portland in a dense fog at a speed of about 15 miles an hour solely in fault for a collision with a stationary dredge which was working in the channel, on the ground of excessive speed.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 215; Dec. Dig. § 100.*]

Appeal from the District Court of the United States for the District of Oregon.

Suit in admiralty by the Port of Portland against the Steamboat Bailey Gatzert, The Dalles, Portland & Astoria Navigation Company, claimant, and cross-libel by the claimant. Decree for libelant (170 Fed. 101), and claimant appeals. Affirmed.

Charles H. Carey, James B. Kerr, and Harrison Allen, for appellant.

Williams, Wood & Linthicum, for appellee.

Before GILBERT and MORROW, Circuit Judges, and HUNT, District Judge.

MORROW, Circuit Judge. This suit was commenced by the filing of a libel by the port of Portland, a municipal corporation, owner of the hydraulic dredge Portland, against the steamboat Bailey Gatzert, to recover damages for injuries to the dredge Portland, caused by a collision between the Bailey Gatzert and the dredge on the morning of November 6, 1907, in the channel of the Willamette river, at a point about nine miles below the city of Portland. The damage claimed by the libelant for the injuries to the dredge was $25,000. In a cross-libel filed by the Dalles, Portland & Astoria Navigation Company, owner of the steamboat Bailey Gatzert, it was charged that the collision was the fault of the dredge, and for injuries received by the Bailey Gatzert in the collision damages were claimed in the sum of $2,500. The libel alleged that the dredge was without motive power; and that on the morning of November 6, 1907, was engaged in dredging the channel of the Willamette river at a point nearly abreast of Willamette slough, and was at that time affixed to the bed of the Willamette river by means of a spud and anchors attached to cables on board the dredge; that the morning of November 6th was foggy, and fog bells were rung on board the dredge in accordance with law and regulations of the United States inspectors of steam vessels. It was charged, notwithstanding the fact that said morning was foggy, the Bailey Gatzert, while being navigated on a voyage down the Willamette river from Portland to The Dalles, was up to the instant of collision navigated by her master at full speed, and although the bell of the Portland was being rung at intervals as required by law the master of the Bailey Gatzert failed and neglected to observe the bell of the Port-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

land, and himself navigated the Bailey Gatzert at such a high and dangerous rate of speed in said fog that when the Portland came into view of the Bailey Gatzert he failed to check the headway of the Bailey Gatzert, and collided with the dredge, causing the dredge to sink within a few minutes.

It was charged in the cross-bill and answer that, notwithstanding the fact that the morning was foggy, the dredge Portland was lying at anchor in the channel and fairway of the Willamette river at the point mentioned, and in such position that the Bailey Gatzert, following the usual and customary course of steamboats down the river, would necessarily collide with the dredge if not forewarned of her position in the channel; that the libelant so negligently and carelessly conducted itself and so misbehaved in the management of the dredge that fog bells were not rung on board of said dredge in accordance with the law or regulations of the United States inspectors of steam vessels for inland waters of the Pacific Coast, requiring vessels at anchor to ring a fog bell rapidly for about five seconds at intervals of not more than one minute. The District Court found the Bailey Gatzert to have been at fault in running at such a high rate of speed that after the dredge could be seen through the fog the Bailey Gatzert could not by reversing her engines come to a standstill and avoid a collision with the dredge. The court also found that the bell on the dredge was rung at appropriate intervals while the Bailey Gatzert was approaching; and that the fault resulting in the collision was entirely that of the Bailey Gatzert. The court accordingly dismissed the cross-bill, and awarded a decree in favor of the libelant, which, upon the testimony relating to the damages sustained by the dredge, was fixed at $18,058.28.

The Bailey Gatzert is a steam stern-wheel vessel. Her gross tonnage is 642; her net tonnage is 536. She is 194.3 feet in length, and 32.8 feet in width, with a depth of 8 feet. She was at the time of the collision engaged in the passenger and freight service between Portland on the Willamette river and The Dalles on the Columbia river.

The dredge Portland was a hydraulic river dredge; scow shape. She was 130 feet in length, and 36 feet in width, with a depth of hull of 11 feet, and a normal draught of 5 feet. She had two spud wells on each side of the stern of the dredge. Each of these wells carried a spud, which, projecting through the hull of the dredge, was driven into the bed of the river to such a distance that it held the dredge securely in place. Only one spud was dropped at a time when the dredge was at work, and on these two spuds working alternately the dredge would swing from side to side as on a pivot or trunnion, dredging over an area having a radius of 150 feet. Attached to the forward end of the dredge was the dredging mechanism, consisting of a revolving cutter, supported by a suitable and substantial framework. The revolving cutter cut up the material in the bottom of the river which is pumped up through a pipe, and then carried through a line of pipe supported on pontoons to a distance for deposit. In dredging navigable rivers this material is usually deposited in such places as may be designated by the engineer in charge so that it may not be carried back into the river. In the present case the discharge was through a pipe 20 inches

in diameter and more than 400 feet in length, supported on pontoons leading from the starboard side of the dredge nearly to the eastern shore of the Willamette river. At the time of the collision the dredge was at work dredging the channel of the river on the range between two points on the river designated as the "Linnton and Upper Post Office Lights," the line of range following approximately the channel of the river. The distance between these two points is 9,150 feet. The distance from Linnton Light down the river to the dredge was 5,650 feet, and the distance from the dredge down the river to the Post Office Light was 3,500 feet. The dredge had been placed at this point on Monday morning, November 4th, and had commenced the work of dredging the channel on Tuesday morning, November 5th, about 2:30 o'clock. The work had the approval of the United States engineers. Its purpose was to improve the channel at this place which at this point had 25 feet of water at zero.

On the morning of November 6, 1907, the Bailey Gatzert was bound down the river on her regular voyage from Portland to The Dalles. The master of the vessel, Capt. F. H. Sherman, was at the wheel. The vessel was running in a fog. She passed the Linnton Light five minutes past 8, and at nine minutes past 8, or a few seconds thereafter, the captain sighted the dredge straight ahead of him, and he says at a distance between 100 and 150 feet. He gave the engineer bells for stopping and backing, and placed his wheel hard aport, but failed to avoid a collision. The Bailey Gatzert was going at such a high rate of speed that she drove her bow into the dredge from 12 to 14 feet, crushing timbers averaging in size from 12 by 12 to 14 by 14 inches. The dredger sunk at once.

Was the Bailey Gatzert in fault? The master testified that the vessel was running at half speed, which on that morning was probably about nine miles per hour. The engineer testified that the vessel was under a full-speed bell, but had only been under that bell for a minute and a half or two minutes; that under a full-speed bell the vessel would have gone through the water at about 15 miles per hour. The testimony of the master that they passed Linnton Light five minutes past 8, and that it was nine minutes past 8 a few seconds before the collision, establishes the fact that the vessel had gone a distance of over a mile in four minutes, or at a speed of 15 miles per hour. This was full speed for the four minutes preceding the collision.

Article 16 of the act of June 7, 1897 (Regulations for Preventing Collisions Upon Certain Harbors, Rivers, and Inland Waters of the United States), provides as follows:

"Every vessel shall, in a fog, mist, falling snow, or heavy rain storms, go at a moderate speed, having careful regard to the existing circumstances and conditions." 30 Stat. 99, c. 4 (U. S. Comp. St. 1901, p. 2880).

The moderate rate of speed required by the rules must depend upon the circumstances of the case. What might be considered as moderate speed in unfrequented waters might be immoderate in a situation where the presence of other vessels might reasonably be expected. Spencer on Marine Collisions, § 44, and cases there cited.

The channel of the Willamette river between the Columbia river and

the city of Portland carries a large commerce, and the vessels engaged in its transportation are to be expected at all points and at all hours in passing up or down the river. It was therefore the duty of the Bailey Gatzert to have exercised the utmost caution in navigating this channel in a fog. The Pennsylvania, 86 U. S. 125, 133, 22 L. Ed. 148. A rule applicable to such a situation was to proceed at such a rate of speed as would enable her after discovering a vessel through the fog to have stopped and reversed her engines in time to prevent a collision. The Great Eastern, Brown. & L. 287, 291; The Nacoochee, 137 U. S. 330, 339, 11 Sup. Ct. 122, 34 L. Ed. 687; The Umbria, 166 U. S. 404, 417, 17 Sup. Ct. 610, 41 L. Ed. 1053; The Belgian King, 125 Fed. 869, 876, 60 C. C. A. 451. This she did not do; and she was therefore clearly at fault.

Was the dredge also in fault? A dredge lawfully fixed in a channel for improving it is to be considered as a vessel at anchor, and is under obligation to use the same precautions to guard against collisions that a vessel at anchor is in respect to the exhibition of lights, maintaining a watch, and measures calculated to make its situation known. Spencer on Marine Collisions, § 118. American Dredging Co. v. The Bedowin, 1 Fed. Cas. No. 299. The Virginia Ehrman and The Agnese, 97 U. S. 309, 24 L. Ed. 890. The Portland was lawfully engaged in dredging the channel at the point of collision. She was therefore to be considered as a vessel at anchor. "A vessel when at anchor shall, at intervals of not more than one minute, ring the bell rapidly for five seconds." Article 15, cl. "d," Act June 7, 1897 (30 Stat. 96, 99). The dredge had a bell, but whether it was rung rapidly for about five seconds at intervals of not more than one minute during the fog immediately preceding the collision was a question of fact upon which the evidence was conflicting. The testimony upon this question was furnished by 16 witnesses—4 by deposition, and 12 by testimony in open court. The court reviewed this testimony, and said:

"I think there can be no question that the bell on the dredge was rung at proper intervals during the approach of the Bailey Gatzert, and for several minutes at least before the collision."

We have read this testimony very carefully, and considered it with respect to the situation of each of the witnesses, and their opportunity to know the facts concerning which they testified and we are of the opinion that the court was correct in the conclusion it reached. It was certainly not against the evidence. "The rule is well settled that in cases on appeal in admiralty, when the questions of fact are dependent upon conflicting evidence, the decision of the district judge, who had the opportunity of seeing the witnesses and judging their appearance, manner, and credibility, will not be reversed unless it clearly appears that the decision is against the evidence. The Albany [C. C.] 48 Fed. 565, and authorities there cited." The Alijandro, 56 Fed. 621, 624, 6 C. C. A. 54; The City of Naples, 69 Fed. 794, 796, 16 C. C. A. 421; The Columbia, 73 Fed. 226, 237, 19 C. C. A. 436; The Captain Weber, 89 Fed. 957, 958, 32 C. C. A. 452; Paauhau Sugar Plantation Co. v. Palapala, 127 Fed. 920, 924, 62 C. C. A. 552; Perriam v. Pacific Coast Co., 133 Fed. 140, 144, 66 C. C. A. 206; Peterson & Glynn v. Larsen, 177 Fed. 617.

It is next contended that the dredge did not keep a proper lookout or take the precautions required by the circumstances of the case. It appears from the evidence that one John Cosgrove, who was the day foreman on the dredge, and whose duty it was to ring the bell, was also required to keep a lookout for approaching vessels. This he testified he did on the morning of the collision; but the bell was located forward of the cabin or upper house about midship, and at a distance of not less than 110 feet from the stern of the dredge. The dredge was heading down the stream. The Bailey Gatzert approached the dredge from upstream. It was not possible for Cosgrove to ring the bell for about five seconds at intervals of not more than one minute while stationed at the forward end of the vessel and also keep a lookout from a station at the other end of the vessel. What he did do, he testified, was to keep a lookout up and down the river from his station at the forward end of the dredge by walking to and fro across the vessel when not engaged in ringing the bell. The court held that any supposed dereliction on the part of the lookout by reason of his station did not contribute to the accident; that had the lookout been in the best possible position on the dredge he could not have discovered the Bailey Gatzert sooner than the lookout of the Bailey Gatzert discovered the dredge, and this was too late to avoid a collision.

The efficiency of the bell was a subject of inquiry. The superintendent of the dredge testified that it was a large ship's bell; that it had been taken from the Glanmorogue which had been wrecked on the coast at Clatsop Beach. The bell was produced in court and measured. It had a clear inside diameter of 13 inches with a depth of 11 inches. The hanger above the bell was 8 inches, and the length of the bell was 19 inches in all. The length of the rope attached to the lower end of the clapper was 19 inches. From the top of the bell to the end of the rope was, therefore, 38 inches. The bell was rung by pulling the rope so that the clapper would strike the bell. The efficiency of this bell was tested on the afternoon of the collision. At that time the dredge was sunk, but the bell was about three or four feet above the surface of the water. The bell was rung continuously while four persons went up the river to Linnton Light, and it was found that the bell would be heard very distinctly for a distance from the dredge of approximately 3,600 feet. Having determined that this bell was rung at proper intervals prior to the collision, it does not appear in what way a lookout stationed at the stern or upstream end of the dredge could have more effectively made known the situation of the dredge to the lookout and pilot on the Bailey Gatzert. If the ringing of the bell did not warn them of the location of the dredge for a distance of 3,600 feet upstream, or at any point beyond 150 feet, what could the lookout on the dredge have done to convey to them a more effective warning? Certainly his mere presence at a point on the dredge of 110 feet further upstream would have added nothing to the efficiency of this warning. We think the court was correct in this conclusion.

It is next contended that the dredge remaining at anchor in the channel in the fog then prevailing violated the act of March 3, 1899, c. 425, § 15, 30 Stat. 1152 (U. S. Comp. St. 1901, p. 3543), which provides:

179 F.—4

"That it shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such manner as to prevent or obstruct the passage of other vessels or craft."

This charge does not appear to have been brought to the attention of the court below, and no evidence appears to have been taken with specific reference to that question, but the evidence in the record sufficiently shows that the dredge was not anchored in such manner as to prevent or obstruct the passage of other vessels or craft.

The witness George M. Shaver, pilot on the Bailey Gatzert, testified that the channel at the mouth of the Willamette slough opposite to which the dredge was anchored was about 200 feet wide. On the morning of November 5, 1907, the steamer Stranger on a voyage down the river passed within 60 feet of the dredge, and on the morning of the collision the stern-wheel steamer G. T. Wentworth passed down the river at 8 o'clock, or 9 or 10 minutes before the collision. Neither of these vessels appears to have been prevented or obstructed by the dredge in passing down the river. Both the captain and pilot of the G. T. Wentworth testified that their vessel was about 100 or 150 feet from the dredge as it passed, the dredge being on the starboard side, showing that there was plenty of room in the channel for the passage of vessels up and down the river without encountering the dredge.

It is contended, further, that the damages allowed the libelant were exorbitant, and reference is made to the testimony offered by the libelant and to the cost of raising and restoring the dredge to the condition in which it was prior to the collision. The testimony on the part of the libelant gave this cost in detail, and an examination of the items does not disclose any unreasonable or exorbitant charges. We think the evidence fully and satisfactorily sustains the decree.

The decree of the District Court is affirmed.