### THE LEVIATHAN.

### THE MERCURY.

(District Court, S. D. New York. November 17, 1922.)

1. **Collision ⊃105—Evidence held to show tug with tow was not at fault for collision with stranded vessel in fog.**

Evidence *held* to show that a tug with a tow, which was navigating the Cape Cod Canal with the tide in a fog at a place where she could not tie up, was sounding the proper fog signals, and was not at fault for attempting to avoid a stranded vessel by starting her engines full speed ahead and trying to swing clear of that vessel by a reverse curve, which resulted in the collision between one of the barges in tow and the stranded vessel.

2. **Collision· ⊃81—Vessel aground in fog should not sound signals of anchored vessel.**

Though a vessel which is ashore in a fog should give some warning to other vessels, a distress signal being ample for that purpose, she should not give the signal required by Inland Regulations of June 7, 1897, art. 15 (d) being Comp. St. § 7888, of a vessel at anchor, by ringing her bell, which would tend to confuse an approaching vessel.

In Admiralty. Libel by Astell & Seafoss, owners of the steam lighter Leviathan, against the steamtug Mercury. Libel dismissed.

Park & Mattison, of New York City (A. V. Lynch, Jr., of New York City, of counsel), for libelants.

Bigham, Englar & Jones, of New York City (L. J. Matteson and Andrew J. McElhinney, both of New York City, of counsel), for claimant.

WARD, Circuit Judge. The steam lighter· Leviathan, proceeding westward through the Cape Cod Canal with a fair tide, ran into thick vapor just after passing Bournedale ferry and went ashore on the north bank of the canal, with her stern somewhat angling out, at a point about a mile and a half further down. The canal is here 100 feet wide at the bottom and 150 feet wide at the surface.

Vapors like this are said to be of frequent occurrence in the spring and fall along the canal at places between hills, where the water is warmer than the air. The Leviathan began at once to blow four blasts of her whistle as a distress signal. The Inland Regulations of June 7, 1897, providing for no signal of four blasts, such a signal was quite proper under article 31 (Comp. St. § 7905), which reads:

"Art. 31. When a vessel is in distress and requires assistance from other vessels or from the shore the following shall be the signals to be used or displayed by her, either together or separately, namely:

"In the daytime: A continuous sounding with any fog signal apparatus, or firing a gun."

---

⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In answer to this call the canal tug George F. Randolph was dispatched from the Buzzard's Bay Railroad bridge, about a mile and a half west of the place of collision, and she did so, blowing the usual fog signal of one blast as she proceeded.

The tug Mercury, with a tow of two light schooner type barges abreast on a bridle hawser 60 to 70 feet long, and a light barge trailing behind, also met this vapor a little below Bournedale ferry, and slowed, and afterwards stopped her engines. The three barges were each 160 to 170 feet long and 35 feet in beam.

It is stipulated that the Leviathan passed Sagamore bridge at 6:01 a. m. and Bournedale ferry, which is a mile to the westward, at 6:19, while the tug Mercury passed the Sagamore bridge at 6:37, and the ferry at 6:47. It follows that at Bournedale ferry the Mercury was some 28 minutes behind the Leviathan, in which time she would have reached the Leviathan, about a mile and a half away, on the ebb tide, even with her engines stopped.

The Mercury was blowing the fog signal for a steam vessel with a tow, of one long and two short blasts. She heard the Randolph's signal, and the Randolph heard hers; but those on the Mercury say they did not hear any signal from the Leviathan, while those on the Leviathan, with one exception—the deck hand—say they did not hear any signal from the Mercury.

[1] I find that the Mercury was blowing fog signals because the law required her to do so; it was natural for her to do so. The master of the Randolph, a disinterested witness, heard the signal, and Sanborn, the canal pilot on the Leviathan, heard them for 10 minutes before the collision. I also find that, after the Leviathan knew that a tug was coming to her assistance, she stopped blowing the distress signal; it is not pretended that she ever blew any other.

The vessels did not discover each other until they were within some 50 feet, whereupon the Mercury, which was then heading crosswise of the channel for the Leviathan, immediately started her engines full speed ahead, hard-astarboarded, so as to swing the tug clear, which she did, and then hard-aported, to swing the tow clear, which she did not succeed in doing. The starboard quarter of the starboard barge struck the port quarter of the Leviathan, shoving her up on the riprap which forms the edge of the canal.

Traffic is allowed to go through the canal only with a fair tide, and there are no means of tying up on the banks; the dolphins or mooring posts being unfit for use. There was nothing for the Mercury with her long tow to do, when once in, but to proceed, and I think she took the best possible course under the circumstances, in starting up her engines full speed and trying to swing clear of the Leviathan by a sort of reverse curve, which I have heard watermen describe as snapping the whip. It may be that, if the Mercury had heard signals from the Leviathan, she would have performed this maneuver sooner and performed it successfully.

[2] Counsel for the Mercury say that in any event the Leviathan blew the wrong signal; that she was required by article 15 (d) of the Inland Regulations of June 7, 1897 (Comp. St. § 7888), to ring a bell:

"Art. 15 (d) A vessel when at anchor shall, at intervals, of not more than one minute, ring the bell rapidly for about five seconds."

I need not decide this, because the Mercury is making no claim, and I find her to be free from fault. However, I suggest that such a construction of the regulations would be dangerous. A dredge afloat, held by spuds to the ground, with water all around, may be the equivalent of an anchored vessel, and obliged to ring a bell in fog. The Kennebec (D. C.) 167 Fed. 847; The Bailey Gatzert, 179 Fed. 44, 102 C. C. A. 612. But this does not apply to a vessel ashore. The Circuit Court of Appeals of this circuit has held that vessels at the outer end of piers in fog should give some warning to other vessels navigating in the vicinity, but not navigating or anchored signals. The Jersey Central, 221 Fed. Rep. 625. A distress signal would be ample for this purpose. If a vessel ashore and in distress needs to blow a signal of distress and is required to ring her bell, it seems to me other vessels in the fog would be embarrassed. They might well take such signals to be from two separate vessels and navigate accordingly; or, if the vessel ashore was only ringing a bell, approaching vessels might well take it for granted that she was afloat at anchor, with water on both sides, and themselves run ashore in trying to pass on the shore side.

The libel is dismissed, with costs.